[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 19, 2012
JOHN LEY
CLERK

No. 11-14666
Non-Argument Calendar
_____

D.C. Docket No. 1:10-cr-20808-AJ-1


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DOUGLAS PUPO-REYNALDO,
a.k.a. Douglas Pupo,
a.k.a. Douglas Perez,
a.k.a. Reynaldo Pupo,
a.k.a. Juan Perez,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(June 19, 2012)

Before HULL, MARTIN and KRAVITCH, Circuit Judges.

PER CURIAM:

Douglas Pupo-Reynaldo appeals his conviction for possession of a firearm by a convicted felon on the ground that the district court erred by denying his motion to suppress the evidence seized from his home. After a thorough review of the record, we affirm.

## I.

Pupo-Reynaldo was indicted for possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g). The indictment identified four different firearms and five different types of ammunition found in Pupo-Reynaldo's possession. Prior to trial, he moved to suppress the firearms and ammunition seized from his house on the grounds that police entered his home without a warrant, with no exigent circumstances, and without the voluntary consent of any of the residents. He explained that the consent form signed by his common-law wife, Iraime Baguet, was signed after the search and was not voluntarily given.[1]

Several detectives testified at the suppression hearing about how an investigation into a home-invasion scheme lead them to Pupo-Reynaldo. Detective Joe Mendez testified that he was assigned as a task force officer with the

---

[1] Pupo-Reynaldo also challenged the admission of the observations by officers stationed on the roof during the search, arguing that the officers had trespassed onto his roof and thus had no lawful vantage point to witness him allegedly throwing the firearms out a window. The district court granted Pupo-Reynaldo's motion to suppress this evidence, and the government does not appeal. Therefore, we do not discuss this issue here.

DEA, and had worked on the home-invasion investigation, but was not directly involved with Pupo-Reynaldo's case. Mendez had received information about a planned armed robbery from a source, and he passed the information on to the police. He had no recollection of Pupo-Reynaldo's case. During Mendez's testimony, defense counsel attempted to impeach Mendez with potentially conflicting statements: Although he had stated earlier that he received information about the home invasion from a confidential source, Mendez later denied that he had obtained information from a registered confidential informant. He also denied receiving an extra day of paid vacation for his participation in the home invasion case, despite records showing that he was credited one vacation day during the month of the investigation.

Detective Yaniel Hernandez, an investigator with the Miami-Dade Police Department's robbery bureau, who was directly involved in Pupo-Reynaldo's case, testified that his unit was investigating the alleged home-invasion robbery in October 2010. On the night of October 25, after officers exhausted all investigative techniques, they decided to visit Pupo-Reynaldo's house to conduct a "knock and talk" consensual encounter. The plan was to make contact and either dispel or confirm the allegation of a home invasion robbery.

According to Hernandez, at approximately 11:00 p.m., Hernandez and

3

Detective Scott Ogden knocked on the front door of Pupo-Reynaldo's house. They were dressed in tactical vests with "police" written in big letters on the front and back. Iraime Baguet quickly opened the door and Hernandez, speaking to her in Spanish, identified himself as a Miami-Dade police officer and asked to speak to Pupo-Reynaldo. Baguet was very cooperative and immediately invited the detectives into the house. She called for Pupo-Reynaldo, who appeared at the top of the stairs naked. Hernandez identified himself and stated that he wished to speak with him. Pupo-Reynaldo agreed, but asked to get dressed first. Seconds later, Hernandez heard a metal cling and then heard over the radio, "[h]e's coming out of the house with guns." Hernandez and Ogden went up the stairs and cleared the upstairs rooms to make sure no one was hiding there. In one room, they found a baby sleeping in a bed. Two other officers located Pupo-Reynaldo and took him into custody.

Hernandez went downstairs to speak to Baguet, who had become very nervous and was crying. She expressed concern for her children in the house. Hernandez explained to her that Pupo-Reynaldo had thrown guns out of the second story window. Hernandez brought Baguet upstairs to see the baby sleeping, after which she calmed down. Hernandez then brought Baguet back downstairs and asked for consent to search the house. Baguet agreed, and

4

Hernandez reviewed the written consent form with her in Spanish. Hernandez confirmed that no one had their guns pointed at Baguet, no one threatened to do anything with her children, and no one promised Baguet anything in exchange for her consent. Once Baguet signed the form, police searched the house and found bear spray, multiple masks, and gloves, along with the firearms and ammunition.

Hernandez later obtained a written statement from Baguet in which she admitted that she gave police permission to enter and search the house. Baguet further wrote that she had no idea there were guns in her house and that Pupo-Reynaldo had only been living with her for one month. She also explained how she met him and stated that Pupo-Reynaldo's ex-girlfriend named DixMarie had brought the boxes of ammunition when she delivered Pupo-Reynaldo's belongings.

Miami-Dade Police Detective Scott Ogden testified that he was at the door with Hernandez and did not remember Hernandez saying anything when he knocked. Ogden confirmed that Baguet opened the door and let the officers enter. After they spoke to Pupo-Reynaldo and allowed him to get dressed, Ogden heard a metallic clanging sound and then heard over the radio that Pupo-Reynaldo was going out a window. He then heard another communication that Pupo-Reynaldo had thrown guns out the window.

The remaining officers involved in the October 25 encounter provided testimonies that were largely consistent with those given by Hernandez and Ogden.[2]

Iraime Baguet provided conflicting testimony. She stated that on the night of October 25, 2010, she and Pupo-Reynaldo went to bed before 11:00 p.m. At some point, Baguet's teenage son came into the room and told her that the police were on the neighbor's roof. Around 11:40 p.m., Baguet heard a hard knock on the door and someone say, "open the door, police department." By the time she got down the stairs and into the living room, four or five police officers were inside the house because her son had opened the door. Two of the officers spoke Spanish and asked her if there were any weapons or drugs in the house.

Baguet testified that the officers then called to Pupo-Reynaldo, who was upstairs. Pupo-Reynaldo was wearing only his underwear and he asked to get dressed before talking to police. Two or three officers ran upstairs and a little while later, they came downstairs with Pupo-Reynaldo. Baguet asked about her children and the police told her that they were fine. The police asked her to sign a consent form to search the house before she could see her children. She signed the

_____

[2] There was conflicting testimony about the number of officers in the house and who was involved in Pupo-Reynaldo's arrest. These inconsistencies are not relevant to the validity of the initial entry and the consent to search.

form because the police were already inside the house and she did not have anything to hide. Once she signed the form, she was allowed to see her children.

According to Baguet, after she signed the consent form and came downstairs, she was handcuffed. When police uncuffed her later, they asked her to sign a written statement. The police told her they were going to give her another chance and threatened to take her children away from her if she did not cooperate. The police also called her brother to take the children. One of the officers told her to write that the police had come to the house, she had opened the door, and she had seen Pupo-Reynaldo throw the weapons out the window. She testified that she complied because she was afraid for her children, but said the statement was false and she did not see Pupo-Reynaldo with any guns. Baguet admitted that it was her signature on the consent form and that the statement was in her handwriting. But she explained that she lied for her children and would do it again if she needed to, although she would not lie for Pupo-Reynaldo. And although she visited him in jail regularly and spoke to him by phone everyday, Pupo-Reynaldo did not ask her to lie for him.

The magistrate judge recommended granting in part and denying in part the motion to suppress. The magistrate judge found that Baguet's testimony was not credible because she had a motive to provide testimony favorable to the defense

7

and because she stated that she would lie for her children. The magistrate judge also found that, based on Hernandez's and Ogden's credible testimonies, the initial entry onto Pupo-Reynaldo's property was a permissible "knock and talk." The magistrate judge further found that the search of the house was permissible based on Baguet's voluntary consent. The magistrate judge declined to address Mendez's credibility, finding it was not relevant to the legality of the entry or the voluntariness of the consent.

The district court adopted the recommendation over all objections. Following a three-day trial, the jury convicted Pupo-Reynaldo, and the district court sentenced him to 78 months' imprisonment. This is Pupo-Reynaldo's appeal.

## II.

"A district court's ruling on a motion to suppress presents mixed questions of law and fact." *United States v. Ramirez-Chilel*, 289 F.3d 744, 748-49 (11th Cir. 2002). We review "findings of fact for clear error and the application of the law to those facts *de novo*." *United States v. Martinelli*, 454 F.3d 1300, 1306 (11th Cir. 2006). In reviewing the district court's ruling, we must construe the facts in the light most favorable to the prevailing party below. *United States v. Smith*, 459 F.3d 1276, 1290 (11th Cir. 2006). Whether an individual's consent was voluntary

is a factual finding that we review only for clear error. *United States v. Zapata*, 180 F.3d 1237, 1240-41 (11th Cir. 1999).

Credibility determinations are within the province of the fact finder "because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses." *Ramirez-Chilel*, 289 F.3d at 749. Furthermore, if testimony presented by opposing witnesses at a hearing is in "direct conflict," the district court's decision to lend credence to one party's version should be "conclusive" and warrants reversal only if the court credits "*exceedingly* improbable" testimony. *Id.* (internal quotation marks omitted). Likewise, we "must accept the evidence unless it is contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable factfinder could accept it." *Id.* (internal quotation marks omitted).

## III.

The Fourth Amendment provides that: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . ." U.S. Const. amend. IV. The Fourth Amendment is not implicated by entry onto private land for legitimate police purposes unconnected with a search of the premises. *United States v. Taylor*, 458 F.3d 1201, 1204 (11th Cir. 2006). "Absent express orders from the person in

9

possession, an officer may walk up the steps and knock on the door of any man's castle, with the honest intent of asking questions of the occupant thereof." *Id.* (internal quotation marks omitted). We refer to this principle as the "knock and talk" exception to the Fourth Amendment's warrant requirement. *See, e.g.*, *id.* at 1205.

Additionally, a warrant is not required when a search is made pursuant to voluntary consent. *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990). Consent is voluntary "if it is the product of an essentially free and unconstrained choice." *United States v. Purcell*, 236 F.3d 1274, 1281 (11th Cir. 2001) (internal quotation marks omitted). The government bears the burden of proving the existence of valid consent that is given freely and voluntarily. *United States v. Blake*, 888 F.2d 795, 798 (11th Cir. 1989). Our review of a consent determination usually turns on "credibility choices resulting from conflicting testimony." *United States v. Garcia*, 890 F.2d 355, 359 (11th Cir. 1989).

Pupo-Reynaldo argues that the magistrate judge failed to make proper credibility determinations and disregarded inconsistencies in the officers' testimony. He contends that the police intended to search his home when they conducted the "knock and talk," and that Baguet's consent was not voluntary.

After reviewing the record, we disagree. First, nothing in the record

10

demonstrates that the magistrate judge made improper credibility determinations. The magistrate judge did not credit the testimony of the law enforcement officers simply because they were officers. Nor did he find Baguet's testimony lacking in credibility solely because of her relationship with Pupo-Reynaldo. Rather, the magistrate judge explained that Baguet's testimony was not credible because she had demonstrated a willingness to lie, and he noted that her written statement contained facts, such as the name of Pupo-Reynaldo's ex-girlfriend, that law enforcement would not have known. And the magistrate judge noted that Baguet's testimony was uncorroborated even though her teenage son, who was present during the search, and her brother, who police allegedly called during the search, could have testified.

Additionally, there was no error in the magistrate judge's decision not to make a credibility determination about Mendez's testimony. Mendez's testimony about how he learned of the alleged home invasion was not relevant to whether the officers gained lawful entry into Pupo-Reynaldo's house and whether Baguet voluntarily consented to the search.

Second, nothing in the record shows that the magistrate judge erred by concluding that the officers intended to pursue a valid "knock and talk." The officers directly involved in making contact with Pupo-Reynaldo each testified

11

that they did so to prevent the anticipated home invasion from occurring.

Third, the magistrate judge properly determined that the officers' entry into the house was lawful. The officers' testimony established that Hernandez knocked on the door and Baguet opened it and invited the officers inside. There is nothing in the record that demonstrates that Hernandez's testimony was "exceedingly improbable." *See Ramirez-Chilel*, 289 F.3d at 749.

Lastly, the magistrate judge did not clearly err in determining that Baguet voluntarily consented to the search. In his role as fact-finder, the magistrate judge found Baguet's testimony not credible. *See id.* Although there were some inconsistencies between the officers' testimony with regard to the events relating to Pupo-Reynaldo's arrest, none of those inconsistencies made Hernandez's testimony about obtaining the written consent "exceedingly improbable." *Id.* Additionally, Baguet testified that she signed the consent form because she did not have anything to hide. Based on this testimony, the magistrate judge properly concluded that Baguet gave voluntary consent to the search.

For the foregoing reasons, we affirm the district court's denial of the motion to suppress.

**AFFIRMED.**

12